UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY C. SEIFTS, et al.,

                Plaintiffs,

- against -

CONSUMER HEALTH SOLUTIONS LLC, et al.,

                Defendants.

05 Civ. 09355 (RJH)

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

      Defendant TIG Premier Insurance Company ("TIG") moves under Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure to dismiss in its entirety the amended complaint ("AC") filed by plaintiff Jeffrey C. Seifts ("Seifts") and others similarly situated (collectively, the "plaintiffs"). In the alternative, TIG moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In the amended complaint, plaintiffs allege nine separate causes of action against TIG—including breach of contract, unjust enrichment, conversion, and fraud—based on the plaintiffs' alleged participation in a group health care plan into which they paid premiums, but from which they received no benefits. Plaintiffs have not opposed the motion. For the reasons stated below, defendant's motion for summary judgment is granted as to the third, fifth, sixth, thirteenth, and fourteenth causes of action; and defendant's motion to dismiss is granted as to the second, fourth, eighth, and ninth causes of action.

1

**BACKGROUND**

The following facts are drawn from plaintiffs' amended complaint.

Seifts was the owner of a for-profit association known as Consumer Advocates Group, Ltd. ("CAG"). (AC ¶ 3.) In late summer 2004, Seifts, on behalf of CAG, contacted defendant FleetCare Group LLC ("FleetCare") to inquire about setting up a group health care plan that he could offer to members of CAG. (AC ¶ 50.) In August of 2004, Seifts began initial negotiations with defendants Bart Posey and Obed Kirkpatrick, both of whom were agents of FleetCare. (AC ¶¶ 53-54.) After several telephone conversations, Kirkpatrick and Posey informed Seifts that FleetCare could accommodate CAG's insurance needs and proposed a program (later known as the FleetCare CU 1000P Medical Program, or "the Plan"), which "would combine a fully insured cash indemnity plan with a hospital-only component." (AC ¶¶ 54-56.) Kirkpatrick and Posey told Seifts that the Plan was underwritten by Central United Insurance Company ("Central United") and the administration of the Plan would be handled by the Affinity Group, a company operating out of North Carolina. (AC ¶¶ 55, 60.)

On or about September 23, 2004, Seifts and his associate, Dennis Raynola, met in Nashville, Tennessee with Posey and Kirkpatrick to discuss the material terms of the Plan, including PPO pricing, membership identification cards, and third party administration protocol and implementations. (AC ¶¶ 59-60.) At this meeting the parties reached an oral agreement. (AC ¶ 60.) A final agreement was reached on October 15, 2004, after which CAG members began to enroll in the Plan using Central United application forms. (AC ¶¶ 61, 63.) The Plan's effective start date was November 1, 2004. (AC ¶ 67.)

As part of this agreement, CAG tendered six checks made payable to FleetCare: a check in the amount of $33,606.93 dated October 27, 2004, a check in the amount of $1,321.77 dated

October 27, 2004, a check in the amount of $32,108.68 dated December 1, 2004, a check in the amount of $30,574.34 dated December 28, 2004, a check in the amount of $31,210.01 dated February 4, 2005, and a check in the amount of $33,441.45 dated March 7, 2005.  (AC ¶ 67.) FleetCare deposited all of the checks into an account at Prime Trust Bank in Nashville Tennessee. (AC ¶ 67.)

On or around November 1, 2004, some of the plaintiffs received word that the underwriting carrier, Central United, had been "rolled over," and that the new underwriting carrier would be TIG.  (AC ¶ 69.)  It is not clear in the amended complaint from where this information came.  When Seifts learned of the alleged "roll over," he contacted Posey and Kirkpatrick, who assured him that "nothing changed" with respect to the healthcare plan program and benefit coverage for the Plan participants.  (AC ¶ 71.)  Posey and Kirkpatrick, however, did inform Seifts that the Plan now would be administered by defendant Consumer Health Solutions LLC ("CHS"), and not the Affinity Group. (*See* AC ¶ 71.)

CHS was wholly owned by defendant William Worthy ("Worthy"). (AC ¶ 16.)  Plaintiffs at the time believed that Worthy also had an ownership interest in TIG, but he in fact did not. (AC ¶¶ 69, 70.)  However, Worthy's employee, defendant Jollene Priester, allegedly was a duly authorized agent for TIG in a number of states, although not in New York nor in any other state in which participants in the CAG Plan resided.  (*See* AC ¶ 32, 37).  According to the complaint, she "endorse[d] and witness[ed]" the plaintiffs' applications. (*Id.* ¶ 33.)  In addition, on January 1, 2005, a company called CHS Admin LLC, who also is a defendant in this action, executed an "administrative service agreement" with TIG, pursuant to which CHS Admin LLC would serve as TIG's "non-exclusive agent for the purpose of issuance, delivery and administration of

policies or contracts of insurance." (AC ¶ 36.)  Worthy signed the agreement as "President" of CHS Admin LLC. (*Id.*)

On November 17, 2004, Worthy, Posey, and Kirkpatrick met with Seifts and his staff to clarify the material terms of the Plan.  (AC ¶ 72.).  Defendants explained to the staff that CHS would be the new third party administrator for all claims submitted by Plan participants. (AC ¶¶ 16, 22, 71).  The defendants indicated that the Preferred Provider Organization networks available to the Plan participants were Multiplan, PHCS, and Beechstreet. (AC ¶ 73.)  The defendants also delivered new healthcare identification cards (AC ¶ 75.)

In the subsequent months, however, a number of healthcare providers refused to accept the Plan participants' healthcare cards and, as a result, some participants were denied medical services. (AC ¶¶ 76, 78.)  Furthermore, eligible claims submitted to CHS by Plan participants were not paid or were paid in error.  (AC ¶¶ 76.)  Seifts informed Posey and Worthy about these problems, but CAG members' claims continued to be ignored. (AC ¶¶ 81-82.)  After several months of inquiries, it became clear to plaintiffs that defendants were not going to pay these claims. (AC ¶ 86.)  Plaintiffs subsequently brought this action, contending that the defendants intended to deny them healthcare benefits and to "convert premiums and Plan proceeds for [defendants'] own collective and individual use." (AC ¶ 92.)  TIG now moves to dismiss the claims against it, or, in the alternative, for summary judgment.

## DISCUSSION

### I.     Legal Standard

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).  On a motion to dismiss under Rule

12(b)(6) the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir. 2009).  The complaint's allegations, however, must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Thus the Court is "not bound to accept as true a legal conclusion couched as a factual allegation" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S. Ct. at 1950).

If, on a motion to dismiss, a district court is presented with materials outside the pleadings, it can either "exclude[] the extrinsic documents" or "convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by [Fed. R. Civ. P.] 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002); *see* Fed. R. Civ. P. 12(b).  Conversion will be proper provided the parties "'should reasonably have recognized the possibility that the motion might be converted into one for summary judgment [and were not] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.'" *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 592 (2d Cir. 1993) (quoting *In re G&A Books*, 770 F.2d 288, 295 (2d Cir.1985)); *see* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice*

5

*& Procedure* § 1366, at 188, 198 (3d ed. 2004) (stating that notice of conversion is sufficient "when the parties were otherwise apprised of the conversion or the likelihood of conversion by less formal or direct means and, in fact, had a sufficient opportunity to present the materials relevant to a summary judgment motion").  Here, TIG has submitted an affidavit from Sharon Mattingly, the Vice-President of Claims and Administration for Fairmont Specialty Group, TIG's parent company, and the plaintiffs have had ample opportunity to submit evidence of their own, but have chosen not to do so.  Mattingly's affidavit is relevant to plaintiffs' claims for breach of contract, fraud, negligence, negligent misrepresentation, and to their claims under the New York business law and the New York insurance law.  Accordingly, the Court will treat TIG's motion as a motion for summary judgment with respect to those claims.

   Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor.  *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex,* 477 U.S. at 325.

   If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact."  *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996).  In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials,

conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## II.  Claims Analyzed Under Rule 56

### A. Breach of Contract

Plaintiffs claim that they entered into an agreement for a healthcare insurance program ("the Plan") on or about October 15, 2004. (AC ¶ 121.) Plaintiffs further contend that defendant TIG was the underwriting insurer when the Plan became effective on November 1, 2004. (AC ¶ 69.). TIG now moves for summary judgment, arguing that it was never a party to the October 15 agreement.

Under New York law, the elements of a breach-of-contract action are "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages." *Palmetto Partners v. AJW Qualified Partners*, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011). The existence of a contract requires "an offer, acceptance, consideration, mutual assent and intent to be bound." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y.2006). Mutual assent requires, in turn, "a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract." *Id.* TIG argues that this element, the existence of a contract, is lacking here.

In support of its motion, TIG offers Mattingly's affidavit. Mattingly asserts that she conducted a search of TIG's records to determine whether TIG had any involvement with the events or parties underlying plaintiffs' claims. (Mattingly Aff., 4.) This search, she claims, confirmed that at the time plaintiffs entered into the Plan with FleetCare, TIG had no relationship

7

with any of the parties in this litigation. (Mattingly Aff., 5).  Furthermore, she asserts that it was not until January 1, 2005 that TIG entered into a non-exclusive administrative services agreement with CHS Admin LLC. (Mattingly Aff., 5.)  TIG has presented a signed copy of the agreement with the "effective date" of January 1, 2005. (Mattingly Aff. Ex. B, 1-31.)  Plaintiffs do not contest that the relationship did not begin until this date.

In exhibits attached to their complaint, plaintiffs provided documents purporting to demonstrate TIG's involvement with the parties and events described in the complaint.  These documents consist of a sample TIG policy form, a TIG commission waiver agreement form, a TIG broker agreement form, a TIG new business transmittal form, a TIG general agent contract form, and a description of the "TIG Premiere Plan." (Mattingly Aff. Ex. D, 3-65.)   None of these documents, however, are signed by an employee or agent of TIG. (Mattingly Aff., 6.)  Furthermore, Mattingly asserts that the sample policy form is the only TIG-generated document, and TIG has no record of the additional forms.  (Mattingly Aff., page 6.)  Plaintiffs have provided no evidence to contradict TIG's characterization of these facts.  Even with respect to Priester, who allegedly endorsed the plaintiffs' applications on behalf of TIG, there is no evidence to suggest that she in fact had authority to bind TIG and likewise no evidence that TIG ever executed any policies that she allegedly endorsed.  Thus, the Court finds that there are no issues of material fact with respect to TIG's relationship with either the plaintiffs or codefendants prior to January 1, 2005.  As a matter of law, there was no relationship, and accordingly there was no "meeting of the minds" between plaintiffs and TIG or any of its agents sufficient to support the existence of a contract.

Moreover, TIG stresses that even after the administrative services agreement took effect, CHS Admin LLC and its employees never had the authority to bind TIG to a contract.  Under

New York law, an individual may not bind an insurer to policies if she has neither actual nor apparent authority to enter into such agreements. *See Standard Funding Corp. v. Lewitt*, 678 N.E.2d 874, 875 (1997). An individual's actual authority in such circumstances is defined by the terms of the agreement between the individual and the insurer. *See id.* By contrast, an individual's apparent authority is determined by "words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Id.* at 551 (quoting *Hallock v. State of New York,* 474 N.E.2d 1178, 1181). In New York, where an insurer's agent has the power to solicit applications, deliver executed policies, and collect premiums, "[i]t is now firmly established … that such an agent has apparent authority to bind the company unless the assured had notice of an actual limitation upon his authority." *Abbott v. Prudential Ins. Co. of Am.*, 24 N.E.2d 87, 89 (1939); *see Broidy v. State Mut. Life Assur. Co. of Worcester, Mass.*, 186 F.2d 490, 491 (2d Cir. 1951).

Here, the administrative services agreement between TIG and CHS Admin LLC did not permit CHS Admin LLC to bind TIG to insurance contracts. The agreement gave CHS Admin LLC the authority to solicit policies, collect premiums, and to "issue, countersign, and deliver Policies *executed by authorized officers of the Company* [TIG]." (Mattingly Aff. Ex. B at 1 (emphasis added).) Moreover, the agreement provides, "With respect to the Policies which Administrator [CHS Admin LLC] is now or may in the future be authorized to solicit, Administrator will not transact, quote, underwrite, or bind under this Agreement." (*Id.* at 2.) Consequently, the agreement makes clear that CHS Admin LLC did not have the actual authority to bind TIG to any policy.

9

CHS Admin LLC, however, had apparent authority to bind TIG because CHS Admin LLC had the authority to solicit policies and to collect premiums on TIG's behalf, and there is nothing to suggest that plaintiffs were aware of the actual limitations on CHS Admin LLC's authority.  Nonetheless, plaintiffs do not allege that they purchased insurance through CHS Admin LLC.  Rather, the amended complaint contends that the plaintiffs' paperwork and claims were handled by CHS, a separate entity.  In addition, TIG has offered evidence that none of the plaintiffs in this action attempted to purchase insurance through CHS Admin LLC pursuant to the administrative services agreement between CHS Admin LLC and TIG. (*See* Mattingly Aff. 5)   Indeed, Mattingly asserts that when she compared the list of plaintiffs in this action to the list of participants covered by the January 1, 2005 administrative services agreement, she found no matches. (*Id.*)  Accordingly, plaintiffs cannot establish the existence of a contract between themselves and TIG because, although CHS Admin LLC had apparent authority to bind TIG, there is no evidence that the plaintiffs ever interacted with CHS Admin LLC.  With respect to Priester, who allegedly was an authorized agent of TIG, plaintiffs claim that she "endorse[d] and witness[ed]" the plaintiffs' applications.  This fact alone, however, is not enough to show that Priester had apparent authority under *Abbot* to bind TIG because there is no evidence that Priester had the authority to deliver executed policies or collect premiums, either at the time of signing or otherwise, as *Abbot* requires.  TIG thus has met its burden of showing that there is an absence of evidence to support plaintiffs' breach of contract claim and plaintiffs have failed to present specific evidence showing that there is a genuine issue for trial.  Thus, TIG is entitled to summary judgment on plaintiff's breach of contract claim.

### B. Fraud, Negligence, and Negligent Misrepresentation

Plaintiffs allege that TIG is liable for its codefendants' fraudulent conduct because TIG had a principal-agent relationship with CHS or CHS Admin LLC at the time of the alleged fraud. (*See* AC ¶ 114, 116.)  "A principle is liable for an agent's misrepresentations [or other frauds] that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority."  *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, (1982); *see also In re South African Apartheid Litig.* 633 F.Supp.2d 117, 120 (S.D.N.Y. 2009) ("'It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents ... in the scope of their authority.'" (quoting Meyer v. Holley, 537 U.S. 280, 285 (2003))).  Here, as discussed above, defendants have shown that, as a matter of law, no agency relationship existed between TIG and CHS or CHS Admin LLC prior to the administrative agreement on January 1, 2005.  Thus, TIG cannot be liable for any misrepresentations made by CHS or CHS Admin LLC prior to that agreement.  Furthermore, after the January 1, 2005 agreement, although CHS Admin LLC had apparent authority to bind TIG to insurance contracts, the complaint does not allege any action on the part of CHS Admin LLC that could be construed as fraudulent.  Indeed, aside from acknowledging CHS Admin LLC's administrative service agreement with TIG, the complaint does not mention CHS Admin LLC at all. Thus, there is nothing for which TIG can be vicariously liable.  TIG accordingly is entitled to judgment as a matter of law and plaintiffs' claims for fraud and negligence and negligent misrepresentations are dismissed.

### C. New York Insurance Law § 3224-a and New York General Business Law § 349

Because the Court has found that TIG did not enter into an agreement with plaintiffs, was not the underwriting insurer of the Plan, and otherwise had no contact with the plaintiffs, plaintiffs' claims that TIG violated New York Insurance Law § 3224-a and New York General Business Law § 349 must be dismissed. *See* N.Y. Ins. Law § 3224-a (applicable to "health care claims submitted under *contracts or agreements*" (emphasis added)); N.Y. Gen. Bus. Law § 349 (applicable to "[d]eceptive acts or practices in the conduct of any business").

### III. Claims Analyzed Under Rules 12(b)(6) and 12(c)

#### A. Breach of Implied Contract

Plaintiffs allege that, even if there was no formal contract between them and TIG, there was an implied contract that TIG breached when it failed to provide medical benefits. (*See* AC ¶ 135.)  Under New York law, a claim for an implied contract "requires that [the] plaintiff prove that there were inferences to be drawn from the conduct of the parties that they intended to be bound by a contract." *Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495 (S.D.N.Y. 2001). "A contract cannot be implied where the facts 'are inconsistent with its existence.'" *Id.* at 512 (quoting *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 399 (S.D.N.Y.1998)).  In addition, "'[t]he assent of the person to be charged is necessary, and, unless he has conducted himself in such a manner that his assent may fairly be inferred, he has not contracted.'" *Id.* (quoting *Ellis*, 3 F. Supp. 2d at 399).  Here, plaintiffs allege that TIG entered into an implied contract for services when it accepted plaintiffs' premiums. (AC ¶ 135.)  Plaintiffs, however, fail to allege any facts showing that TIG in fact accepted premiums from CAG or from the Plan participants.  The amended complaint contains nothing to suggest that TIG either received or

deposited plaintiffs' premium payments.  To the contrary, the plaintiffs admit that the premiums paid by CAG for health care benefits were "deposited into the general operating accounts of FleetCare LLC" and "were not submitted to the carrier." (AC ¶ 77.)  Without allegations to suggest that TIG accepted the premium payments, plaintiffs' claim that TIG entered into an implied contract by manifesting an intent to be bound is not plausible. *See Twombly*, 550 U.S. at 570.  Accordingly, plaintiffs' claim for breach of implied contract is dismissed.

### B.  Unjust Enrichment and Quantum Meruit

Plaintiffs also allege that TIG should be liable because it has been unjustly enriched by the premium payments made by Plan participants. (*See* AC ¶ 111, 132.)  Under New York law, it is proper to "analyze quantum meruit and unjust enrichment together as a single quasi contract claim."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).  "In order to recover in *quantum meruit,* New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (internal quotation marks omitted).  Here, as discussed above, plaintiffs' amended complaint fails to allege facts to suggest that TIG received plaintiffs' premium payments.  Consequently, plaintiffs have not plausibly alleged the second element of a quantum meruit claim—"the acceptance of the services by the person to whom they are rendered."  For the same reason, plaintiffs have not alleged facts to show that TIG has been unjustly enriched.  Accordingly, plaintiffs' claims for quantum meruit and unjust enrichment are dismissed.

### C. Conversion

Plaintiffs' claim for conversion likewise is dismissed. Under New York law, "conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 660 N.E.2d 1121 (1995)). A conversion claim "requires that the defendant exclude the owner from exercising her rights over the goods." *Id.* (citing *New York v. Seventh Regiment Fund, Inc.*, 774 N.E.2d 702 (2002)). Although plaintiffs have alleged facts that suggest that they tendered multiple payments for health care benefits, the amended complaint fails to allege any facts to suggest that TIG exercised any right of ownership over these payments. Indeed, as discussed above, the amended complaint admits that the payments were never submitted to TIG. (*See* AC ¶ 77.) Accordingly, plaintiffs' conversion claim is dismissed.

## CONCLUSION

For the reasons stated above, defendant TIG's motion for summary judgment [68] is GRANTED as to the third, fifth, sixth, thirteenth, and fourteenth causes of action; and defendant's motion to dismiss [68] is GRANTED as to the second, fourth, eighth, and ninth causes of action.

SO ORDERED.

Dated: New York, New York

September 30, 2011

Richard J. Holwell
United States District Judge